02-10-435-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00453-CV

 

 


 
 
 Weatherford Texas Hospital Company, LLC d/b/a
 Weatherford Regional Medical Center
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Kerry and Lea Riley, Individually and as Parents
 and Next FrIend of Brandon Riley, A Minor
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

 

FROM THE 43rd
District Court OF Parker COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

I.  Introduction

          Appellant
Weatherford Texas Hospital Company, LLC d/b/a Weatherford Regional Medical
Center (WRMC) appeals from an order denying its motion to dismiss the health
care liability claims of Appellees Kerry and Lea Riley, individually and as
parents and next friend of Brandon Riley, a minor.  We will affirm.

II.  Background

          According
to the expert reports tendered by Appellees, at approximately 10:00 p.m. on
December 12, 2007, Lea presented to WRMC in active labor.  The attending
physician “documented a concerning description of [Lea’s] pelvis by noting
‘prominent pubic arch, a blunt ischial spine, and a flat sacrum.’”  Richard
Cardenas, M.D. and Nora Robinson, R.N. assumed caring for Lea sometime during
the next morning.  At 1:30 p.m. on December 13, 2007, Nurse Robinson documented
that Lea was completely dilated but that the “infant [was] not descending well”
despite “good pushing efforts” by Lea.  At 1:50, 1:58, and 2:10 p.m., Dr.
Cardenas applied a vacuum extractor for an attempted operative vaginal delivery,
during which time there were multiple “pop-offs.”[2] 
After three failed attempts using the vacuum, Dr. Cardenas delivered Brandon
using forceps.  Brandon’s “condition deteriorated rapidly” after he was
admitted to the nursery, and he was transferred to Cook Children’s Medical
Center, where he was diagnosed with “an extensive and severe cephalohematoma, a
skull fracture, both epidural and subdural hemorrhages, a consumptive
coagulopathy, a cerebral infarction/stroke, seizures, and acute tubular
necrosis.”

          Appellees
sued Dr. Cardenas and WRMC for damages proximately caused by the defendants’
alleged negligence.  As to WRMC, Appellees alleged in part that “the nursing
staff failed to advocate on behalf of [Lea] and [Brandon] during the labor and
delivery of [Brandon]”; “the nursing staff failed to use the hospital’s chain
of command policy and advocate for a change in the medical plan as required
under prudent practice with these circumstances”; “the nursing staff failed to
recognize the clinical significance of the long and protracted labor curve
during delivery”; “the nursing staff and hospital policies failed to advocate
against the use of forceps or vacuum extraction to shorten labor”; and the
nurses “fail[ed] to recognize the significance of the document[ed] narrow
pelvic arch of [Lea] and the need for a cesarean section delivery when the
labor chart indicated cephalopelvic disproportion.”[3]

          Appellees
timely served WRMC with two expert reports authored by L. Justin Gayle, M.D.
and one expert report authored by Marina A. Hoffman, BSN, RNC.  WRMC filed
objections to the reports and a motion to dismiss Appellees’ suit.  The trial
court sustained WRMC’s objections to Dr. Gayle’s reports on the ground that they
were insufficient as to causation regarding the conduct of WRMC, but it denied
WRMC’s objections to Nurse Hoffman’s report and granted Appellees a thirty-day
extension to cure the deficiency in Dr. Gayle’s reports.  Dr. Gayle
supplemented his two reports, and WRMC filed objections to the supplemental
report and again moved to dismiss Appellees’ claims against WRMC.  The trial
court overruled WRMC’s objections and denied WRMC’s motion to dismiss, and this
accelerated, interlocutory appeal followed.

III.  Adequacy
of Causation Opinion

          In
its only issue, WRMC argues that the trial court abused its discretion by failing
to dismiss Appellees’ claims because in the absence of speculation, conclusory
statements, and inferences, Dr. Gayle’s report as supplemented does not link
the conduct of WRMC’s nurses to the harm allegedly sustained by Appellees.  WRMC
thus contends that Dr. Gayle’s report does not constitute a good-faith effort
to fairly summarize the causal relationship between WRMC’s alleged breach of
the applicable standards of care and Appellees’ injuries.[4]

          We
review a trial court’s order on a motion to dismiss a health care liability
claim for an abuse of discretion.  Jernigan v. Langley, 195 S.W.3d 91,
93 (Tex. 2006).  A trial court abuses its discretion if it acts in an arbitrary
or unreasonable manner, or if it acts without reference to any guiding rules or
principles.  Bowie Mem’l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002)
(citing Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42
(Tex. 1985), cert. denied, 476 U.S. 1159 (1986)).

          Civil
practice and remedies code section 74.351 provides that within 120 days of
filing suit, a plaintiff must serve expert reports for each physician or health
care provider against whom a liability claim is asserted.  Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(a) (West 2011).  An expert report is a
written report by an expert that provides a fair summary of the expert’s
opinions regarding the applicable standard of care, the manner in which the
care rendered by the physician or health care provider failed to meet the
standard, and the causal relationship between that failure and the injury,
harm, or damages claimed.  Id. § 74.351(r)(6).  If a claimant
timely furnishes an expert report, a defendant may file a motion challenging
the report’s adequacy.  Id. § 74.351(a), (c), (l).  A trial
court must grant a motion to dismiss based on the alleged inadequacy of an
expert report only if it finds, after a hearing, “that the report does not
represent an objective good faith effort to comply with the definition of an
expert report” in the statute.  Id. § 74.351(l).

          The
information in the report does not have to meet the same requirements as
evidence offered in a summary judgment proceeding or at trial, and the report
need not marshal all of the plaintiff’s proof.  Am. Transitional Care Ctrs.
of Tex., Inc. v. Palacios, 46 S.W.3d 873, 878–79 (Tex. 2001) (stating that
the “plaintiff need not present evidence in the report as if it were actually
litigating the merits”).  But an expert report must provide enough information
to fulfill two purposes if it is to constitute a good-faith effort:  the report
must (1) inform the defendant of the specific conduct the plaintiff has
called into question and (2) provide a basis for the trial court to
conclude that the plaintiff’s claims have merit.  Id. at 879.  A report
does not fulfill these two purposes if it merely states the expert’s
conclusions.  Id.; see Bowie Mem’l Hosp., 79 S.W.3d at 53.  The
expert must explain the basis for his statements and must link his conclusions
to the facts.  Baylor Univ. Med. Ctr. v. Rosa, 240 S.W.3d 565, 570 (Tex.
App.—Dallas 2007, pet. denied).  A report that fails to explain how a breach
caused injury is reasonably determined to be conclusory.  Bowie Mem’l Hosp.,
79 S.W.3d at 53.  Further, a trial judge may not draw any inferences but must
rely exclusively on the information contained within the four corners of the
report.  Id.; see Collini v. Pustejovsky, 280 S.W.3d 456, 462
(Tex. App.—Fort Worth 2009, no pet.) (stating that court may not fill gaps in
report by drawing inferences or guessing what expert likely meant or intended).

          Regarding
the standard of care for Labor and Delivery nursing staff under the
circumstances in this case, Dr. Gayle opined in part,

3)       The L&D
nurse is expected to review the prenatal records for problems and correlate
these findings to the labor and delivery process.  The nurse should understand
the clinical significance of protracted labor disorders, particularly when the
patient has documented concerns for size of pelvis. . . .

 

4)       The L&D
nurse is expected to be a patient advocate and understand hospital chain of
command policies.  In the event that a nurse identifies a clinical scenario
that would jeopardize the well-being of a mother or baby, the nurse is expected
to advocate for a change in the medical plan. . . .  The nurse
should advocate a change in the medical plan by utilization of the hospital
chain of command. . . .

 

5)       The
L&D nurse is expected to have a basic working understanding of the
indications and contraindications for operative vaginal deliveries, including
the use of vacuum extraction and forceps. . . .  The use of
vacuum extraction and forceps are contraindicated in a patient with a
dysfunctional labor, arrest of descent[,] and a narrow pelvis.  The use of BOTH
vacuum extraction and forceps in an operative vaginal delivery are also
contraindicated. . . .[5]

          Dr.
Gayle opined that Nurse Robinson breached the applicable standards of care in
part because she “did not appreciate the significant and dangerous risk created
by a long and protracted labor and arrest of descent[] in a patient with
clearly documented concerns about the size of the pelvis”; did not “request an
open discussion of the medical plan with the attending physician” and, if
necessary, implement the hospital chain of command; and did not “realize the
contraindications of proceeding with operative vaginal delivery in a patient
with protracted labor curve[] and arrest of descent.”[6]

          After
setting out how WRMC breached the applicable standards of care, Dr. Gayle
identified how the nursing care caused Appellees’ injuries as follows:

NURSING
CARE CAUSATION OPINION

          If the
L&D nursing staff at the hospital had complied with the standard of care,
[Brandon] would have been delivered via c-section.  If a c-section had been
p[er]formed, the brain injuries suffered by [Brandon] during the operative
vaginal delivery p[er]formed by Dr. Cardenas would have been avoided. 
[Brandon] suffered a skull fracture, epidural and subdural hemorrhages, facial
lacerations, and a massive cephalohematoma.  These brain injuries sustained by
[Brandon] were caused by the use of vacuum extractor x3 and forceps in a
patient with clear evidence of arrest of descent, a dysfunctional progress of
labor[,] and a contracted pelvis.

          Simply
put, Dr. Gayle opined that had the nursing staff appreciated the significant
risk to Brandon associated with Lea’s protracted labor and arrest of descent,
realized the contraindications of proceeding with operative vaginal delivery in
light of the circumstances, and either requested an open discussion of the
medical plan with the attending physician or implemented WRMC’s chain of
command, Brandon would not have suffered brain injuries because he would have
been delivered by cesarean section instead of having been delivered vaginally with
a vacuum extractor and forceps.  Dr. Gayle explained the basis for his opinions
and satisfactorily linked WRMC’s purported breaches of the standards of care to
Appellees’ injuries.  See Rosa, 240 S.W.3d at 570.  The trial
court did not have to infer anything.

          WRMC
argues that Dr. Gayle’s causation opinion is inadequate because he speculates
and infers that Dr. Cardenas would have to have taken the nursing staff’s “word
for it” and chosen to perform a cesarean section instead of a vaginal
delivery.  But section 74.351 does not prohibit experts, as opposed to
courts reviewing expert reports, from making inferences based on medical
history.  See Benish v. Grottie, 281 S.W.3d 184, 195 (Tex. App.—Fort
Worth 2009, pet. denied) (citing rules of evidence 703 and 705); see also
Bowie Mem’l Hosp., 79 S.W.3d at 53.  WRMC does not challenge Dr. Gayle’s
qualifications to opine on causation in this appeal.  See Tex. Civ.
Prac. & Rem. Code Ann. § 74.403 (West 2011).  Nor does WRMC challenge Dr.
Gayle’s opinion that “[t]he diagnosis of cephalopelvic disproportion[] clearly
applies here[] and is a contraindication to operative vaginal delivery of any
means.”  Considering Lea’s medical history, including her clear diagnosis of
cephalopelvic disproportion, the protracted labor, the arrest of descent, and
the documented concerns about the size of her pelvis, and in light of Dr.
Gayle’s unchallenged qualifications, he is not precluded from concluding that
Dr. Cardenas—or some other physician if the nursing staff had implemented
WRMC’s chain of command policy—would have performed a cesarean section instead of
a vaginal delivery had the nursing staff not breached the applicable standards
of care.  See, e.g., Univ. Med. Ctr. v. Ward, No. 07-07-00046-CV, 2007
WL 2403361, at *2–3 (Tex. App.—Amarillo Aug. 23, 2007, no pet.) (mem. op.)
(overruling appellant’s challenge on causation grounds to expert’s opinion
“that if the nurses had timely recognized the symptoms associated with cord
compression and taken the stated measures, there is a high likelihood that the
fetus would have been delivered by [c]esarean section ‘alive and intact’”).

          Moreover,
this is not an appeal involving a post-discovery summary judgment proceeding,
nor is it an appeal challenging a jury’s findings after a trial on the merits. 
The trial court could have reasonably concluded that Dr. Gayle’s report provides
enough information to inform WRMC of the specific conduct that Appellees have
called into question and to provide a basis for the trial court to conclude
that Appellees’ claims have merit.  See Palacios, 46 S.W.3d at
879.  Dr. Gayle’s report thus constitutes a good-faith effort to fairly
summarize his opinions about the causal relationship between WRMC’s alleged
breaches of the applicable standards of care and Appellees’ injuries.  See
Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l), (r)(6).  We hold
that the trial court did not abuse its discretion by denying WRMC’s motion to
dismiss.  We overrule WRMC’s only issue.

IV.  Conclusion

          Having
overruled WRMC’s sole issue, we affirm the trial court’s order.

 

 

 

BILL MEIER
JUSTICE

 

PANEL: 
DAUPHINOT,
GARDNER, and MEIER, JJ.

 

DELIVERED:  June 23, 2011








 









[1]See Tex. R. App. P. 47.4.





[2]A pop-off is “a break in
the suction mechanism, when the pressure of pulling exceeds the pressure
generated by the suction device of the vacuum.”





[3]According to one of
Appellees’ experts, cephalopelvic disproportion is “a condition in which a
maternal pelvis is small in relation to the size of the fetal head[,] which
makes a safe vaginal delivery difficult or impossible.”





[4]To the extent that
Appellees asserted direct theories of liability against WRMC in addition to the
vicarious liability theories based on the nursing staff’s acts or omissions,
WRMC does not raise any challenge to Appellees’ tendered reports.





[5]A contraindication is “an
indication, symptom, or condition that makes inadvisable a particular treatment
or procedure.”  Webster’s Third New Int’l Dictionary 495 (3d ed. 2002).





          [6]Nurse Hoffman opined similarly
regarding WRMC’s breach of the applicable standards of care, concluding as
follows:

 

1.       The Labor
and Delivery nurses at [WRMC] failed to recognize the clinical significance of
the long and protracted labor curve. . . .  Despite the
documented long and protracted labor, the nursing staff did not advocate any
change in the medical plan of care by failing to implement the hospital’s chain
of command policy.

 

2.       The Labor
and Delivery nurses caring for [Lea] failed to appreciate the significance of
the well documented “narrow pelvic arch” and “a prominent pubic arch”
. . . as documented by the attending physicians . . . . 
Of equal significance was the fact that the nurse noted in [her] own nursing
documentation that the baby was “not descending well” in [the] birth canal
despite “good pushing efforts” by [Lea]. . . .  All these
factors, individually and collectively, clearly would have prompted a [L]abor
and [D]elivery nurse to have a discussion or conference with the attending physician
to question the safety and/or efficacy of continuing with a Pitocin
augmentation or about the possibility of a cephalopelvic disproportion and the
need for a cesarean section delivery.

 

3.       In light of the
dysfunctional labor progress and the protracted descent of the fetal head, the
Labor and Delivery nurses caring for [Lea] failed to recognize and appreciate
the contraindications for a vacuum extraction or subsequent forceps delivery
and should have prompted her to request a conference with the physician, and
charge nurse, or to implement the hospital chain of command to discuss whether
to proceed with attempting an operative vaginal
birth . . . .